1 | RON BENDER (SBN 143364)
2 | TODD M. ARNOLD (SBN 221868)
  | LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
3 | 10250 Constellation Boulevard, Suite 1700
  | Los Angeles, California 90067
4 | Telephone: (310) 229-1234
  | Facsimile: (310) 229-1244
5 | Email: rb@lnbyb.com; tma@lnbyb.com

6 | Proposed Attorneys for Chapter 11 Debtors and Debtors in Possession

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
(SACRAMENTO DIVISION)

| In re: | [Proposed] Lead Case No. 10-39672 (MSM) |
| MATTERHORN GROUP, INC., | [Proposed] Jointly Administered with Case Nos. 10-39664 (MSM), and 10-39670 (MSM).[1] |
| Debtor. | DC No. LNB-1 |
|  | Chapter 11 Cases |
| VITAFREZE FROZEN CONFECTIONS, INC., | **DECLARATION OF JENNIFER K. LOVING IN SUPPORT OF DEBTORS' EMERGENCY MOTION FOR AN ORDER (1) AUTHORIZING THE DEBTORS' USE OF CASH COLLATERAL ON AN INTERIM BASIS PENDING A FINAL HEARING, (2) SCHEDULING A FINAL HEARING, (3) AUTHORIZING THE DEBTORS' CONTINUED USE OF CERTAIN PORTIONS OF THE DEBTORS' CASH MANAGEMENT SYSTEM, AND (4) AUTHORIZING THE MAINTENANCE OF THE DEBTORS' EXISTING BANK ACCOUNTS FOR AN INTERIM PERIOD** |
| Debtor. | |
| DELUXE ICE CREAM COMPANY, | |
| Debtor. | |
| ☒ Affects ALL DEBTORS<br>☐ Affects only MATTERHORN GROUP, INC.<br>☐ Affects only VITAFREZE FROZEN CONFECTIONS, INC.<br>☐ Affects only DELUXE ICE CREAM COMPANY | Hearing:<br>Date: TBD<br>Time: TBD<br>Place: Department A<br>Judge Michael S. McManus<br>Courtroom No. 28<br>Floor No. 7<br>Robert T. Matsui Courthouse<br>501 I Street<br>Sacramento, CA 95814 |

---
[1] Motion for Joint Administration pending.

FILED
July 26, 2010
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
0002805164

## DECLARATION OF JENNIFER K. LOVING

I, Jennifer K. Loving, hereby declare as follows:

1. I am over 18 years of age. Except where otherwise stated, I have personal knowledge of the facts set forth below and, if called to testify, I could and would testify competently thereto.

2. I have a Bachelor of Science in accounting degree from West Virginia State University. I am the Chief Financial Officer of Matterhorn Group, Inc. ("MGI"), Vitafreze Frozen Confections, Inc. ("Vitafreze"), and Deluxe Ice Cream Company ("Deluxe"), the debtors and debtors in possession in the above-captioned (proposed) jointly administered Chapter 11 bankruptcy cases (collectively, the "Debtors"). I have held this position since 2007. I have no ownership interest in the Debtors. Prior to joining the Debtors, (a) in 1994 and 1995, I was a Staff Accountant at Wheat First Butcher Singer, (b) in 1995 through 2001, I was the Corporate Assistant Controller at James River Coal Corp., (c) in 2001 and 2002, I was a Corporate Account Manager at VMS, Inc., (d) in 2002 through 2005, I was the Controller at Heritage Country Club, and (e) in 2005 through 2007, I was the Chief Financial Officer of Red Rock Country Club.

3. I make this Declaration in support of the Debtors' motion for an order (1) authorizing the Debtors' use of cash collateral on an interim basis pending a final hearing, (2) scheduling a final hearing, (3) authorizing the Debtors' continued use of certain portions of the Debtors' cash management system, and (4) authorizing the maintenance of the Debtors' existing bank accounts for an interim period (the "Motion"). Unless otherwise stated, all capitalized terms herein have the same meanings as in the Motion and the Memorandum of Points and Authorities filed in support thereof.

4. On July 26, 2010 (the "Petition Date"), the Debtors each filed voluntary petitions under Chapter 11 of 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"). The Debtors continue to operate their business, manage their financial affairs, and operate their bankruptcy estates as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

5. MGI was formed in 2004 as a vehicle to "roll-up" frozen novelty manufacturing companies in the Western United States. The initial step in this strategy was MGI's acquisition of Vitafreze, Deluxe, and Matterhorn Ice Cream Company ("Matterhorn"),[2] each of which became wholly owned subsidiaries of MGI. As a result of these acquisitions, by 2005, the Debtors had (1) established themselves as high-quality, high-service private label manufacturers with a strong Western United States customer base, and (2) become one of the dominant producers of ice cream novelties in the Western United States.

6. In 2006, in an effort to improve operations and profitability, MGI (1) closed Matterhorn's manufacturing plant in Caldwell, Idaho and consolidated its manufacturing into Vitafreze, located in Sacramento, California, and Deluxe, located in Salem, Oregon, and (2) took aggressive steps to restructure its remaining operations to reduce overhead and reposition MGI with its customers and suppliers. The Debtors' administrative office is located in Las Vegas, Nevada.

7. In the ordinary course of the Debtors' business, the Debtors' create business books and records (the "Books and Records") regarding, among other things, the Debtors' assets, depreciation of assets, liabilities, income, expenses, and transactions. More particularly, the Debtors' Books and Records are made at or near the time by, or from information transmitted by, a person with knowledge, in the ordinary course of the Debtors' business and as a regular practice of the Debtors' business. All information contained herein regarding gross revenues, loan balances, employees, equity holders, asset valuations, and bank accounts, is based on (1) the Debtors' Books and Records, the preparation of which I am materially involved in and oversee and the contents of which I am readily familiar, (2) my personal knowledge, and/or (3) my opinion.

8. At present, the Debtors, which have approximately 31 non-union employees and 226 union employees, are collectively one of the largest independent producers of ice cream and

---

[2] Matterhorn is also a wholly owned subsidiary of MGI. Matterhorn is not operating and has not filed a bankruptcy case.

water-ice novelty products in the United States. The Debtors manufacture (1) self-branded products for grocery retailers, (2) products from brand licenses held by the Debtors, such as Mike and Ike™, HotTamales™, Zours™, and Crystal Light™ popsicles, (3) co-branded products, and (4) the Debtors' own products, including the Debtor's Oh My! Goodness™ branded products. The Debtors' customers include the largest big-box grocery retailers, club stores, and independent cooperative distribution companies in the United States, such as Wal*Mart, Sam's Club, Giant Eagle, Kroger, Stater Brothers, Albertsons, Winco Foods, Raley's, Save Mart Supermarkets, Safeway, Smart & Final, the Schwan Food Company, and Western Family. The Debtors also sell to various retailers in Mexico.

9. The Debtors' primary secured creditor is Key Bank, N.A. (the "Bank"). As of the Petition Date, pursuant to that certain Amended and Restated Revolving Credit and Term Loan Agreement (as amended) (the "Loan Documents"), the Debtors owed the Bank approximately $1,249,983 on a term loan (the "Term Loan") and approximately $9,314,953 on a revolving line of credit (the "Line" and together with the Term Loan, the "Bank Loans") for a total of approximately $10,564,936. The Bank Loans are allegedly secured by first priority liens on substantially all of the Debtors' assets, including the Debtors' cash collateral (the "Cash Collateral"). Under the Loan Documents, (1) the amount available under the Line is based on 80% of eligible accounts receivable and 60% of eligible inventory, subject to periodic step downs in total maximum availability, which is currently $9.5 million, and (2) the Bank Loans mature on July 1, 2011.

10. In addition to the Bank, I understand and believe that the UCC-1 lien reports (the "UCC Reports") obtained by the Debtors' counsel from Idaho, the state in which the Debtors are incorporated, indicate that additional other entities (the "Other Secured Parties") may have liens upon certain of the Debtors' assets. I understand that a true and correct copy of the UCC Reports was filed as Exhibit "3" concurrently herewith. Based on a review of the UCC Reports, I believe that the liens of the Other Secured Parties only relate to particular equipment leased or purchased

by the Debtors. Therefore, I do not believe that the liens of the Other Secured Parties extend to the Debtors' Cash Collateral.

11. During the period of 2007 through 2009, the Debtors gross revenues increased substantially from approximately $42,564,029 in 2007, to approximately $47,986,399 in 2008, to approximately $54,436,328 in 2009. Unfortunately, due to expansion into new product categories, increased costs related thereto, a delayed selling season due to unusually cool temperatures in the Debtors geographical market and the continued need to make capital expenditures to maintain the Debtors' manufacturing facilities, these increases in gross revenue did not result in corresponding increases in net income and liquidity. Instead, based on the foregoing and seasonal fluctuations in the Debtors' business and borrowing limits under the Loan Documents, the Debtors found themselves in a cash crunch and were unable to meet their funding needs solely from advances made by the Bank. As a result, Pacific Mezzanine Fund, L.P. and CC&B Holdings, Inc., two of MGI's primary equity holders, recently infused an additional $0.75 million into the Debtors which was essentially used to pay down Key Bank's revolving credit line as it stepped down $1.0 million on July 1, 2010. In consideration of the Debtors' ongoing cash crunch and the need for breathing room to formulate and implement a restructuring plan or a sale, the Debtors came to the conclusion that filing for bankruptcy protection was in the best interests of the Debtors and their creditors.

12. During the Month of July 2010, Nathan W. Bell, the Debtors' Chairman of the Board, President, and Chief Executive Officer, other members of the Debtors' accounting staff, and I, provided financial data from the Debtors' Books and Records to Andrew DeCamera ("DeCamera") and Jason Caporrino ("Caporrino") of Sherwood Partners, LLC ("Sherwood") to assist in the preparation of the Debtors' proposed operating budget (the "Budget") which was filed as Exhibit "1" concurrently herewith. Additionally, Caporrino made a visit to the Debtors' administrative offices in Las Vegas, Nevada to personally review portions of the Debtors' Books and Records to assist Sherwood in the preparation of the Budget, which includes the most current

fair market valuations of the Debtors' cash, accounts receivable, and furniture, fixtures, and equipment. I have reviewed the Budget and believe that it is accurate.

13. As set forth in the Debtors' (a) proposed operating Budget, a copy of which was filed as Exhibit "1" concurrently herewith, and (b) most recent consolidated balance sheet through June 2010, a copy of which was filed as Exhibit "4" concurrently herewith, as of the close of business on the Petition Date, the Debtors' assets had a fair market value of approximately $24,245,129, as follows:

| Asset | Fair Market Value |
| --- | --- |
| Cash (including checks in transit) | $1,070,539 |
| Accounts Receivable | $5,061,602 |
| Inventory (finished and raw goods) | $8,114,144 |
| Furniture, Fixtures & Equipment (book value net of accumulated depreciation) | $2,721,435 |
| Other Assts (pre-paid insurance, pre-paid license fees, pre-paid promotions, amortizable artwork, etc.) | $1,607,909 |
| Goodwill (including approximately $211,000 of intellectual property) | $5,669,500 |
| Total | $24,245,129 |

14. Given the nature of the Debtors' business (production of ice cream and water-ice novelty products), the Debtors have no ability to survive for more than a few days unless the Debtors are provided immediate use of Cash Collateral to continue with the operation of their business.

15. It is imperative that the Debtors obtain immediate access to their Cash Collateral to pay their operating expenses for, among other things, rent, lease payments, insurance, salaries, wages, raw materials, shipping, utilities, taxes, marketing, etc. Without the ability to use Cash Collateral for these purposes, the Debtors would be forced to immediately shut down their business and cease operations, which would decimate the going concern value of the Debtors' and any chance for a an effective reorganization to the extreme prejudice of the Debtors' creditors and bankruptcy estates.

16. The Debtors' proposed Budget, a copy of which was filed as Exhibit "1" concurrently herewith, contains the expenses the Debtors believe must be paid in order for the

**9**

Debtors to continue to operate and preserve the value of their business pending a reorganization. The expenses contained in the first few weeks of the Budget are those expenses the Debtors believe must be paid to enable the Debtors to avoid immediate and irreparable harm to the Debtors' business and bankruptcy estates. Included in the Budget are the following monthly salaries of the Debtors' "insiders" as that term is defined in Section 101(31): (1) Nathan W. Bell, Chairman of the Board, Chief Executive Officer and President - $25,000, (2) Jennifer K. Loving, Chief Financial Officer - $12,083.33, (3) Linda Pennington, Vice President of Operations - $11,666.66, (4) Greta Remington, Vice President of Sales and Marketing - $16,666.66, (5) Michael Newell, Board Member - $750, (6) John Jex, Board Member - $750, and (7) John Whetten, Board Member - $750. The revenues projected in the Budget are the revenues the Debtors project receiving if business proceeds as planned.

17. The Debtors have four (4) bank accounts (the "Accounts") at the Bank as follows:

| **Account Type and No.** | **Uses** |
|---|---|
| MGI Parent Sweep Account ********3873 | All deposits into the other three accounts discussed below, net of checks cleared, are swept into this account on a daily basis. The Bank draws from this account to pay down the Line. |
| Vitafreze Subsidiary Account ********4443 | Vitafreze deposits check payments into this account. Additionally, approximately 2 of Vitafreze's customers wire payments directly into this account. This account is also used to pay all Vitafreze vendors and employees. The remaining balance in this account is swept into the MGI Parent Sweep Account on a daily basis. |
| Deluxe Subsidiary Account ********4476 | Deluxe deposits check payments into this account. Additionally, approximately 3 of Deluxe's customers wire payments into this account. This account is also used to pay all Deluxe vendors and employees. The remaining balance in this account is swept into the MGI Parent Sweep Account on a daily basis. |
| Deluxe Payroll Account ********8881 | All credits from ADP, the Debtors' payroll processor, are deposited into this account. The balance in this account is swept into the MGI Parent Sweep Account on a daily basis. |

18. I believe that it would be impossible for the Debtors to immediately redirect wire deposits into the Vitafreze and Deluxe Subsidiary Accounts and the Deluxe Payroll Account. Thus, in order to maintain operations and Budget performance, it is essential that the Debtors be allowed to maintain the foregoing Accounts on an interim basis pending redirection of all deposits into debtor in possession accounts. Based on the foregoing, the Debtors request that they be

allowed to maintain the Accounts and the pre-petition cash management system described above, with the following modifications:

    a. The MGI Parent Sweep Account will be closed;

    b. Each of the Debtors will immediately establish debtor in possession ("DIP") accounts at one of the banks appearing on the List of Authorized Depositories issued by the United States Trustee (the "UST") or otherwise approved by the UST;

    c. All check deposits to Vitafreze and Deluxe will be deposited into the DIP Vitafreze Subsidiary Account or the DIP Deluxe Subsidiary Account, as appropriate;

    d. All wire deposits into the Vitafreze Subsidiary Account, the Deluxe Subsidiary Account, and the Deluxe Payroll Account will be swept or transferred to the DIP Vitafreze Subsidiary Account or the DIP Vitafreze Subsidiary Account, as appropriate, on a daily basis (excluding weekends and holidays);

    e. All deposits into the DIP Vitafreze Subsidiary Account and the DIP Deluxe Subsidiary Account, less retentions to cover wires and checks in transit, will be swept or transferred to the DIP MGI Parent Account on a daily basis (excluding weekends and holidays); and

///

///

///

f. As soon as all wire deposits into the Vitafreze Subsidiary Account, the Deluxe Subsidiary Account, and the Deluxe Payroll Account have been redirected to the DIP Vitafreze Subsidiary Account or the DIP Vitafreze Subsidiary Account, as appropriate, the Vitafreze Subsidiary Account, the Deluxe Subsidiary Account, and the Deluxe Payroll Account will be closed.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 26th day of July 2010, at Las Vegas, Nevada.

                                                                        */s/ Jennifer K. Loving*
                                                                         JENNIFER K. LOVING