RON BENDER (SBN 143364)
TODD M. ARNOLD (SBN 221868)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: rb@lnbyb.com; tma@lnbyb.com

Proposed Attorneys for Chapter 11 Debtors and Debtors in Possession

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
(SACRAMENTO DIVISION)

In re:

MATTERHORN GROUP, INC.,

    Debtor.

VITAFREZE FROZEN CONFECTIONS, INC.,

    Debtor.

DELUXE ICE CREAM COMPANY,

    Debtor.

☒ Affects ALL DEBTORS
☐ Affects only MATTERHORN GROUP, INC.
☐ Affects only VITAFREZE FROZEN CONFECTIONS, INC.
☐ Affects only DELUXE ICE CREAM COMPANY

[Proposed] Lead Case No. 10-39672 (MSM)
[Proposed] Jointly Administered with Case Nos. 10-39664 (MSM), and 10-39670 (MSM).[1]

DC No. LNB-2

Chapter 11 Cases

**DECLARATION OF JENNIFER K. LOVING IN SUPPORT OF DEBTORS' EMERGENCY MOTION FOR JOINT ADMINISTRATION**

Hearing:
Date:    TBD
Time:    TBD
Place:   Department A
           Judge Michael S. McManus
           Courtroom No. 28
           Floor No. 7
           Robert T. Matsui Courthouse
           501 I Street
           Sacramento, CA 95814

---

[1] Motion for Joint Administration pending.

## DECLARATION OF JENNIFER K. LOVING

I, Jennifer K. Loving, hereby declare as follows:

1. I am over 18 years of age. Except where otherwise stated, I have personal knowledge of the facts set forth below and, if called to testify, I could and would testify competently thereto.

2. I have a Bachelor of Science in accounting degree from West Virginia State University. I am the Chief Financial Officer of Matterhorn Group, Inc. ("MGI"), Vitafreze Frozen Confections, Inc. ("Vitafreze"), and Deluxe Ice Cream Company ("Deluxe"), the debtors and debtors in possession in the above-captioned (proposed) jointly administered Chapter 11 bankruptcy cases (collectively, the "Debtors"). I have held this position since 2007. I have no ownership interest in the Debtors. Prior to joining the Debtors, (a) in 1994 and 1995, I was a Staff Accountant at Wheat First Butcher Singer, (b) in 1995 through 2001, I was the Corporate Assistant Controller at James River Coal Corp., (c) in 2001 and 2002, I was a Corporate Account Manager at VMS, Inc., (d) in 2002 through 2005, I was the Controller at Heritage Country Club, and (e) in 2005 through 2007, I was the Chief Financial Officer of Red Rock Country Club.

3. I make this declaration in support of the Debtors' motion (the "Motion") for the entry of an order for joint administration of the above-referenced cases (the "Cases"). Unless otherwise stated, all capitalized terms herein have the same meanings as in the Motion and the Memorandum of Points and Authorities filed in support thereof.

4. On July 26, 2010 (the "Petition Date"), the Debtors each filed voluntary petitions under Chapter 11 of 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"). The Debtors continue to operate their business, manage their financial affairs, and operate their bankruptcy estates as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

5. MGI was formed in 2004 as a vehicle to "roll-up" frozen novelty manufacturing companies in the Western United States. The initial step in this strategy was MGI's acquisition of

Vitafreze, Deluxe, and Matterhorn Ice Cream Company ("Matterhorn"),[2] each of which became wholly owned subsidiaries of MGI. The Debtors share common senior management and prepare consolidated financial statements. As a result of these acquisitions, by 2005, the Debtors had (1) established themselves as high-quality, high-service private label manufacturers with a strong Western United States customer base, and (2) become one of the dominant producers of ice cream novelties in the Western United States.

6. In 2006, in an effort to improve operations and profitability, MGI (1) closed Matterhorn's manufacturing plant in Caldwell, Idaho and consolidated its manufacturing into Vitafreze, located in Sacramento, California, and Deluxe, located in Salem, Oregon, and (2) took aggressive steps to restructure its remaining operations to reduce overhead and reposition MGI with its customers and suppliers. The Debtors' administrative office is located in Las Vegas, Nevada.

7. At present, the Debtors, which have approximately 31 non-union employees and 226 union employees, are collectively one of the largest independent producers of ice cream and water-ice novelty products in the United States. The Debtors manufacture (1) self-branded products for grocery retailers, (2) products from brand licenses held by the Debtors, such as Mike and Ike™, HotTamales™, Zours™, and Crystal Light™ popsicles, (3) co-branded products, and (4) the Debtors' own products, including the Debtor's Oh My! Goodness™ branded products. The Debtors' customers include the largest big-box grocery retailers, club stores, and independent cooperative distribution companies in the United States, such as Wal*Mart, Sam's Club, Giant Eagle, Kroger, Stater Brothers, Albertsons, Winco Foods, Raley's, Save Mart Supermarkets, Safeway, Smart & Final, the Schwan Food Company, and Western Family. The Debtors also sell to various retailers in Mexico.

8. The Debtors' primary secured creditor is Key Bank, N.A. (the "Bank"). As of the Petition Date, pursuant to that certain Amended and Restated Revolving Credit and Term Loan

---

[2] Matterhorn is also a wholly owned subsidiary of MGI. Matterhorn is not operating and has not filed a bankruptcy case.

Agreement (as amended) (the "Loan Documents"), the Debtors owed the Bank approximately $1,249,983 on a term loan (the "Term Loan") and approximately $9,314,954 on a revolving line of credit (the "Line" and together with the Term Loan, the "Bank Loans") for a total of approximately $10,564,937. The Bank Loans are allegedly secured by first priority liens on substantially all of the Debtors' assets, including the Debtors' cash collateral. Under the Loan Documents, (1) the amount available under the Line is based on 80% of eligible accounts receivable and 60% of eligible inventory, subject to periodic step downs in total maximum availability, which is currently $9.5 million, and (2) the Bank Loans mature on July 1, 2011.

9. In addition to the Bank, the UCC-1 lien reports obtained by the Debtors from Idaho, the state in which the Debtors are incorporated, indicate that additional other entities (the "Other Secured Parties") may have liens upon certain of the Debtors' assets. Based on a review of the UCC Reports, the I believe that the liens of the Other Secured Parties only relate to particular equipment leased or purchased by the Debtors. Therefore, I do not believe that the liens of the Other Secured Parties extend to the Debtors' cash collateral.

10. During the period of 2007 through 2009, the Debtors gross revenues increased substantially from approximately $42,564,029 in 2007, to approximately $47,986,399 in 2008, to approximately $54,436,328 in 2009. Unfortunately, due to expansion into new product categories, increased costs related thereto, a delayed selling season due to unusually cool temperatures in the Debtors geographical market and the continued need to make capital expenditures to maintain the Debtors' manufacturing facilities, these increases in gross revenue did not result in corresponding increases in net income and liquidity. Instead, based on the foregoing and seasonal fluctuations in the Debtors' business and borrowing limits under the Loan Documents, the Debtors found themselves in a cash crunch and were unable to meet their funding needs solely from advances made by the Bank. As a result, Pacific Mezzanine Fund, L.P. and CC&B Holdings, Inc., two of MGI's primary equity holders, recently infused an additional $0.75 million into the Debtors which was essentially used to pay down Key Bank's revolving credit line as it stepped down $1.0 million on July 1, 2010. In consideration of the Debtors' ongoing cash

crunch and the need for breathing room to formulate and implement a restructuring plan or a sale, the Debtors came to the conclusion that filing for bankruptcy protection was in the best interests of the Debtors and their creditors.

11. I believe that the affairs of the Debtors are sufficiently intertwined to make joint administration of the Cases more efficient and economical than separate administration. Indeed, the Debtors share common senior management and prepare consolidated financial statements. Joint administration should avoid duplicative expenses and ensure that creditors in the Cases will receive appropriate notice of pertinent matters. In addition, I believe that joint administration of the Cases, including the use of a single pleadings docket, the combining of notices to creditors of the different estates, and the joint handling of purely administrative matters will aid in expediting the Cases and rendering the process less costly, without prejudicing the substantive rights of any creditor. To the extent any conflict between the estates herein arises, the Court may take further steps to modify its order of joint administration to eliminate any such conflict. In light of the foregoing, I respectfully submit that the Court should exercise its discretion under Bankruptcy Rule 1015(c) and order joint administration of the Cases.

12. I further believe that joint administration of the Cases will assist the Office of the United States Trustee in forming one (1) committee of unsecured creditors, which should further reduce costs to the estates. Additionally, the joint administration of the Cases should eliminate the need for the Debtors to file identical motions and orders in each of the Cases when seeking relief that is common to all three Debtors, will avoid the further waste of judicial resources related to, for example, the docketing of identical motions, declarations, and orders in the each of the Cases, and will permit the Debtors' estates to avoid the substantial copy costs and service costs associated with filing and serving motions and other pleadings in the Cases that seek collective relief for the Debtors. Moreover, joint administration should eliminate the need for filing duplicative pleadings in each of the Cases and would reduce the burden for the Clerk's Office in administering the Cases.

13. As a result of the foregoing, I respectfully submit that cause exists to grant the Motion. In the event the Court orders the joint administration of the Cases, I respectfully suggest that the following caption be approved and that the Matterhorn Group, Inc. case be used as the lead case:

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF CALIFORNIA**
**(SACRAMENTO DIVISION)**

| In re: | [Proposed] Lead Case No. _____ |
|---|---|
| MATTERHORN GROUP, INC., | [Proposed] Jointly Administered with Case Nos. _____, and _____. |
| Debtor. | DC No. _[_____] |
| VITAFREZE FROZEN CONFECTIONS, INC., | Chapter 11 Case |
| Debtor. | [PLEADING] |
| DELUXE ICE CREAM COMPANY, | Hearing: |
| Debtor. | Date: _____ |
| | Time: _____ |
| ☐ Affects ALL DEBTORS | Place: Department __ |
| ☐ Affects only MATTERHORN GROUP, INC. | Judge ____ |
| ☐ Affects only VITAFREZE FROZEN CONFECTIONS, INC. | Courtroom No. __ |
| ☐ Affects only DELUXE ICE CREAM COMPANY | Floor No. __ |
| | Robert T. Matsui Courthouse |
| | 501 I Street |
| | Sacramento, CA 95814 |

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 26th day of July 2010, at Las Vegas, Nevada.

*/s/ Jennifer K. Loving*
JENNIFER K. LOVING